CASE 42—PETITION EQUITY—MAY 10.

# Louisville City Railway Company v. Central Passenger Railroad Company.

APPEAL FROM LOUISVILLE LAW AND EQUITY COURT.

1. STREET RAILWAYS—COMPENSATION TO ONE COMPANY FOR USE OF TRACK BY ANOTHER.—The Legislature may, after granting to one company a franchise to construct and operate a street railway, grant to another company the right to do a similar business in the same streets either upon the track of the existing company or by the construction of other tracks, provided, however, if the track of the existing company is used, compensation must be made to it for the use of its track, but not for the value of its franchise.

2. SAME.—The city of Louisville having under its charter a voice in the regulation of street railways, entered into a contract with appellant, fixing the route of appellant's road and providing that the council should have the power at any future time to grant to any other company the right to occupy any track already laid down. Thereafter the appellee was chartered, its charter authorizing it to construct and operate its road upon such conditions as the general council might prescribe, the charter defining the route of the road, which was in part the same as that of appellant's road, which had already been constructed. Thereafter appellee entered into a contract with the city, it being agreed that appellee should have the privilege of runing its cars over a certain part of appellant's track "when the consent of said City Railway Company shall be obtained;" whereupon appellee entered into a contract with appellant for the use of appellant's track. *Held*—That the appellee did not derive its right to use appellant's track from the Legislature, but by contract with the city and appellant, the city having the right to require that an arrangement should be made between appellant and appellee before appellee should be allowed to use appellant's track, and, therefore, the rights or equities of the parties must, to a great extent, be determined by the terms of the contract.

3. SAME.—The contract between appellant and appellee provided that appellee should pay to appellant a certain sum for the first year, it being further provided that the terms might be altered from year to year or at any time upon notice, the selection of arbitrators being provided for to determine upon an "equitable consideration" in the event the parties should be unable to agree. In 1881, the contract having been entered into in 1866, appellant gave notice that a change

of terms was desirable, and the parties failing to agree, or to obtain arbitrators, applied to the chancellor to fix the compensation. *Held*— That while appellant is not entitled to the value of the use of the franchise, it is entitled to an equitable consideration, which must have some reference to the injury to appellant's profits resulting from the franchise, and not merely to the value of the use of the rails and ties.

As the parties regarded the use as worth nine hundred dollars in 1866, it should be worth from June, 1881, as much as one thousand five hundred dollars per annum.

ALEX P. HUMPHREY for appellant.

1. Where one street railroad company obtains from the Legislature the right to condemn the privilege of running over the existing tracks of another company, the value of the franchise must be paid as compensation to the company whose tracks are thus entered on. (Judge Redfield's report to the Legislature of Mass., 1 Redfield on Railways, 315, note; Citizens' Coach Co. v. Camden Horse Railway Co., 33 N. J. Eq., 270; Sixth Ave. R. R. Co. v. Kerr, 72 N. Y., 330.)

As to the rights of two companies to occupy the same street under different grants, and the principles which govern the compensation to be made: Metropolitan Railroad Co. v. The Quincy Railroad Co., 12 Allen, 262; Metropolitan Railroad Co. v. Highland Railroad Co., 118 Mass., 290; Lakeshore and Michigan Southern R. R. Co. v. Chicago and Indiana R. R. Co., 100 Ill., 21.

2. The legislative grant to appellee must be construed not as independent and unconditional, but subject to the assent of the council and the terms it might prescribe in giving such assent.

· The construction most favorable to the public is the one preferred in considering such a grant. (Fertilizing Co. v. Hyde Park, 97 U. S., 666.)

3. The appellee cannot now say that its title to the franchise comes from its charter or by direct legislative grant. It is bound by the agreements under which it entered, and by means of which it has been enjoying these valuable privileges, and must pay for them accordingly. (Woodruff v. Detheridge, 6 J. J. M., 369; Hall v. Haun, 5 Dana, 56; Carlyle v. Patterson, 3 Bibb, 93; McClain v. Gregg, 2 Mar., 456.)

BARNETT, NOBLE & BARNETT for appellee.

1. The appellee had a right of way by its charter. It got in its contract with the city, not a right of way, but a right to run cars on appellant's tracks by its consent; and when appellant and appellee contracted, they contracted only for the use of appellant's *tracks*. (Appellant's Charter, Burnett's Code, 595; Appellee's Charter, Burnett's Code, 613; Appellant's Contract with City, Burnett's Code, 694; Appellee's Contract with City, Burnett's Code, 902.)

2. For the "use and wear" of appellant's tracks appellee must pay an equitable consideration, which is a reasonable interest on the investment. (1 Redfield on Railways, 646, 648; M. R. R. Co. v. H. R. R. Co., 118 Mass., 290; Kinsman R. R. Co. v. Newburg R. R. Co., 36 Ohio St., 239.)

3. The city had no power to bargain away its dominion over the public highways. (2 Dillon, 716; L. C. Railway v. Louisville, 8 Bush, 415; 14 La. Ann., 842; Kinsman R. R. Co. v. Newburg R. R. Co., 36 Ohio St., 239; 5 Am. and Eng. R. R. Cases, 327; Applegate v. L. & O. R. R. Co., 8 Dana.)

CHIEF JUSTICE PRYOR DELIVERED THE OPINION OF THE COURT.

This controversy is between the Louisville City Railway Company and the Central Passenger Railroad Company, as to the value of the use of the railway track and the franchise on Fourth street, between Main and Jefferson streets. The power of the city of Louisville to authorize the construction of street railroads is derived from legislative grant, that confers on the general council the authority by contract to empower any corporation or company, etc., to construct street railroads, "*the council reserving all rights to regulate and control the same.*"

The appellant, the Louisville City Railway Company, was chartered on the fifteenth of February, 1864. The second section of its charter providing—

"SECTION 2. The corporation is hereby authorized and empowered to construct, maintain, and operate a single or double-track railway, with all necessary and convenient tracks for turnouts, side-tracks and appendages, in the city of Louisville, and in, on, over, and along such street or streets, highway or highways, within the present or future limits of the city of Louisville, as the general council of said city shall authorize said corporators so to do, in such manner and upon

such terms and conditions, and with such rights and privileges as the said general council may, by contract or otherwise with said corporation, or any of them, prescribe as provided in 'An act for the benefit of the city of Louisville,' approved March 2, 1863 ; but said corporation shall not be liable for any baggage carried on said railways, kept in and under the care of its owner, his servant, or agent."

By virtue of its charter and the power conferred on the city council, a contract was entered into between the city and this company for the construction of street railroads, the terms and conditions of which, or so much as is deemed material to this controversy, is as follows :

"*First.* The general council of the city of Louisville hereby consent and agree that the Louisville City Railway Company may construct and operate a street railroad or railroads, to be operated alone by animal power, on, over, and along the following streets, and the right and privilege to construct and operate said railroad, or railroads, is hereby granted to said Louisville City Railway Company by the general council of the city of Louisville, on, over, and along the following designated streets, to-wit : Commencing at or near Main and Twelfth streets, running through and along Main street with double track to or near Beargrass street, at the eastern end of Main street; also, at Twelfth street to Jefferson street, through and along Jefferson to its junction with the Bardstown turnpike ; also, at Twelfth street and Jefferson street, through and along Twelfth street to Broadway, through and along Broadway to the city limits, in the direction

of Cave Hill Cemetery ; also, from Main street through and along Sixth street to Broadway, with double track; also, commencing on Preston street, near the Ohio river, thence over, along, and through Preston street to the city limits, in the direction of Belleview and Spring Gardens ; and the said railway company shall have the right to connect any of said railways the one with the other.

"If the First and Second-street Horse Railroad Company shall, within thirty days of the signing of this contract, file in the office of the mayor of the city of Louisville, their consent to the rescission of their contract with the city, then in consideration thereof it is made a condition of this grant, irrevocable without the consent of said First and Second-street Horse Railroad Company, that the Louisville City Railway Company shall lay down, under the provisions of this agreement, a line of road from the corner of Fourth and Main streets, out Fourth to Jefferson, up Jefferson to Second, out Second to Breckinridge, within twelve months from the completion of this contract ; said line to be extended up Breckinridge to First street, and out First street to the city limits, whenever the improvements in that part of the city shall render such extension proper, to be determined by the general council ; and it shall not be a breach of this contract if this extension from Breckinridge street is not made in three years from the signing of this contract, unless ordered by the general council ; but the right hereby vested in the Louisville City Railway Company, as expressed in the foregoing clause, shall not confer on said company any right or power before given to the First and

Second-street Horse Railroad Company, unless by the consent of said last-named company, evidenced by writing as aforesaid.

"*Second.* The right of the Louisville City Railway Company, hereby vested in them to operate said railways, shall extend to the full term of thirty years from the date of this agreement, that being the term for which said company is vested with corporate privileges by the Legislature; and at the expiration of said time the said railway company operating said railways shall be entitled to enjoy all of said privileges, on the conditions expressed, until the city of Louisville, by the general council, shall elect by ordinance or resolution for the purpose, to purchase said tracks or said railways, cars, carriages, station-houses, station-grounds, depot-grounds, furniture, and implements of every kind and description used in the construction and operation of said railways, and of the appurtenances in and about the same, and pay for the same in the manner hereinafter mentioned.

"*Third.* Such ordinance or resolution shall fix the time when the city of Louisville will take said railways and other property before mentioned, which shall not be less than six months after the passage of ordinance or resolution; and at the time of taking said railways and property, if the city shall so elect, before mentioned, the city of Louisville shall pay to the said 'Louisville City Railway Company' a sum of money to be ascertained by three commissioners to be appointed for the purpose, as follows: one to be chosen by the general council from the disinterested freeholders of Jefferson county; one in like manner to be

chosen by the said 'Louisville City Railway Company,' and these two persons to choose the third in like manner from said freeholders of Jefferson county; but in making the estimate by the commissioners the city is not to be charged with the right of franchise or right of way over the streets herein granted to said railway company for any value or supposed value growing out of the same.

"*Ninth.* The said 'Louisville City Railway Company' shall, for the franchise and privilege herein granted to construct and operate railways over the streets hereinbefore named, pay into the city treasury of the city of Louisville each and every year, the sum of twenty-five dollars, tax or license, for each and every car run upon their said railways, or such other sum as the general council may fix, not less than twenty-five and not to exceed fifty dollars, for each car so used by said company, so long as said company shall operate said railways, or so long as the same shall be operated by any other company.

"*Eleventh.* The city council shall, at any future time, have the power, when the public good demands, to grant a second or third company or individual the right to occupy any track already laid down, provided the expense of laying and keeping in repair said track so far as used by different companies or individuals, shall be equally borne by all those that use them, but the council shall not have the right to grant a permit to run upon any route already disposed of for a greater distance than one-tenth of the whole route; and provided, that no privilege or right shall be granted to any other company or individual to run to the same

terminal point over the track of the Louisville City Railway Company, or such terminal point or points over their track than the one-tenth of the whole route, but may run upon another street or line to any other point."

Under this contract the Louisville City Railway Company constructed a line of double. track street railway from Fourth and Main along Fourth street to Jefferson, with a stand at Fourth and Main streets.

The appellee, the Central Passenger Railroad Company, was chartered in the year 1865 (29th December), and by the second section of the act was authorized to construct a street railroad as follows:

"SECTION 2. This corporation is hereby authorized and empowered to construct, maintain, and operate a single or double-track railroad, with all necessary and convenient tracks for turnouts, side-tracks and appendages in the city of Louisville, commencing at the intersection of Water and Second streets, and running south over and along Second street to Main street, thence west on Main to Fourth street, thence south over and along Fourth street to Oak street, and over and along Seventh street, from Main street to southern limits of the city; also, on Walnut street, from eastern to western limits of the city, with such further extension in the same or other streets in the city of Louisville as the general council of said city may authorize said corporation so to do, in such manner and upon such terms and conditions, and with such rights and privileges as the general council may, by contract or otherwise, with said corporation or any of them, prescribe."

Under this charter, and by virtue of the power con-

ferred on the city, the Central Passenger Railroad Company contracted with the city, the first section of which is as follows:

"*First.* That in consideration of the payments herein mentioned to be made, and the acts hereinafter stipulated to be done and performed by said Central Passenger Railroad Company, the city of Louisville hereby agrees that said Central Passenger Railroad Company may construct and operate street railroads, to be operated alone by animal power, on, over, and along Fourth and Walnut streets, as hereinafter shown, and the right and privilege to construct and operate said street railroads are hereby granted to said Central Passenger Railroad Company by the city of Louisville, on, over, and along Fourth and Walnut streets, as follows, viz: Commencing at or near Fourth and Jefferson streets, running thence through and along Fourth street, with double track and the necessary turnouts, southwardly to Oak street; also, over and along Walnut street, from Garden to Eighteenth street, with double track; the track to be laid beyond Kentucky street so soon as the street beyond Kentucky street shall be graded. *It is further agreed that the said Central Passenger Railroad Company shall have the privilege of running their cars to Main street, on Fourth street, over the track of the Louisville City Railway Company, as provided in section eleven of the agreement between said Louisville City Railway Company and the city of Louisville, when the consent of said City Railway Company shall be obtained.*"

On the twenty-eighth of June, in the year 1866,

these companies, the Louisville City Railway Company (appellant), and the Central Passenger Railroad Company (appellee), entered into a contract for the use of appellant's tracks on Fourth, between Main and Jefferson streets, by the appellee as follows:

"This contract witnesseth: That the Louisville City Railway Company of the first part, and the Central Passenger Railway Company of the second part, have this day entered into the following agreement: The first party is to permit the second party to have the use of their tracks on Fourth street, between Jefferson and Main streets, in the city of Louisville, for the purpose of running their cars over and along the same for one year from the date hereof, on the following terms and conditions, to wit: The second party is to use said road and run their cars thereon in strict compliance with the contract of the first party with the city, and are to keep said street and tracks in good repair, as is required by the contract of the first party with said city, at their own expense, during the continuance of this contract.

"The second party is to pay the first party, in cash, the sum of nine hundred and thirteen dollars and eighteen cents, which is fifteen per cent. on the actual cost of the construction of the said tracks, the receipt of which is hereby acknowledged.

"The second party also covenants and agrees to pay the contractor with the city of Louisville, for bowldering Fourth street from Main to Jefferson, the sum of five hundred dollars, being the sum agreed to be paid by the first party to said contractor, and the second party do hereby assume said contract for the

first party, and agrees to carry out the same, and hold the first party free and harmless therefrom.

"The second party is to comply with. all the ordinances and laws of the city of Louisville, and the contract of said party with said city in regard to said road and the operating the same, and in every respect to hold the first party free from damage or cost resulting from their failure to keep said road in order, or in not complying with said contract of the first party with the city or the laws and ordinances of said city.

"The second party is to have the use of the stand at Main street, but is not to use it or any part of said track so as in any way to interfere with or interrupt the first party in the free and full use of said road for their own purpose; and to prevent any interference on the part of the second party with the first party in using and operating said road, the second party is to be governed in their use of same by the time-tables of the first party.

"Should any change of the tracks or stand be necessary in operating said road, said change is to be made at the expense of the second party, but under the direction and advice and with the consent of the superintendent of the first party.

"It is also understood and agreed that, in the use of said tracks by the second party, they are not in any way to interfere with the running of the cars of the first party on Jefferson street, and in crossing the Jefferson street tracks the cars of the first party are to have the preference, and the second party are to pay all damage to the first party, or to any one else, that may at any time occur by reason of the privilege

hereby granted to the second party to cross Jefferson
street with their cars.

"It is also hereby distinctly agreed that Main and
Fourth streets is a terminal point of the road of the
first party, and by this contract the second party
claims no right to run over any other road or part
of road belonging to the first party than they other-
wise would have had had this agreement not been
made; and by this agreement it is understood that the
first party guarantees to the second party that they
shall at all times have the uninterrupted use of said
road, but to the extent only that they have the power
to grant or can control the same as above set forth.

"The terms of this contract may be altered from
year to year, or at any time after the expiration
agreed on, upon notice of thirty days by either party.
In the event of such notice, then new *terms are to
be agreed upon.*

"Should the parties hereto be unable to agree, then
each party is to select one person, and, these persons
disagreeing, are to select an umpire to determine upon
an equitable consideration for the privileges herein
granted to the second party. Their decision then
made shall be binding on both parties.

"Should the second party, at any time within ——
days after notified so to do, fail to fully comply with
the terms of this contract, or any that may hereafter
be made by the parties hereto, touching the privileges
herein granted them, then the first party shall have
the right to stop the second party from using said
track and the other privilege herein granted.

"It is understood that the use of the tracks, as

hereinbefore granted, is to be continued to the second party during the charter of the first party, but the terms therefor may be altered as hereinbefore provided for."

Under the terms of this contract, it could be altered from year to year upon notice as provided, and new terms agreed on, and in the event of a disagreement as to the terms, resort was to be had to arbitration, the decision of the arbitrators to determine their respective rights.

The appellant, the City Railway Company, becoming dissatisfied with the terms of the contract or the rental value agreed on, gave the proper notice that a change of terms was desirable, and the parties failing to agree, and making ineffectual efforts to obtain arbitrators, applied to the chancellor to fix the compensation the appellant was entitled to for the use of its tracks by the appellee.

The chancellor on the hearing gave as compensation annually the sum of one hundred and seventy-two dollars and eight cents as rental, and required the appellee, the Passenger Railway Company, in addition, to pay three-fourths of the taxes and the annual cost of maintaining the track, which would amount in all to not exceeding three hundred dollars. Of this judgment the City Railway Company complains.

It is conceded by counsel for the appellant, or, if not, the authorities settle the question, that the grant of the franchise in the first instance to the appellant did not take from the Legislature the right to permit other companies to go upon the same streets of the city, or upon the track of appellant's railway, and

compete with the latter in the business of carrying passengers from one part of the city to the other.

This may be done upon making compensation to the company whose railway track is used, and when not used, such grants not being exclusive, the right to construct other and competing tracks in the same street may be allowed without compensation. If the franchise is exclusive, it only applies to the use of the track by the company owning it, and for this use, and not the value of the franchise, the company owning it is entitled to compensation as against a company desiring a like franchise, although of later date, from the sovereign power.

This seems to be the doctrine recognized by Mr. Redfield in his work on Railways, and in the cases of the Metropolitan Railroad Company v. Quincy Railroad, 12 Allen, 262, and the Metropolitan Railroad Company v. Highland Street Railway Company, 118 Mass., 290 The grant in this case to the appellee includes in its route Fourth street between Main and Jefferson, and having a like franchise, if unrestricted, would entitle it to use the track of the appellant on Fourth between Main and Jefferson, by compensating the latter for the use and wear of its tracks only, and no compensation should be allowed for the injury to the franchise or the profits resulting from it. It is urged by counsel for the appellee that such is the nature of its grant, and that under its charter the right was given, not only to run on the street at the point in controversy, but to use the track of the appellant, and the chancellor below, taking this view of appellee's charter, rendered the judgment complained of. By the

act of March, 1863, the general council of the city of Louisville was authorized to have constructed a railroad or railroads, with single or double tracks, on such streets as it might, by resolution, designate, etc. And further, that "the general council might by contract, sale or bargain, empower any corporation or corporations, parties or company, to construct said street railroads, the general council reserving all rights to regulate and control the same." Under this power vested in the city council the appellant entered into the contract for the construction of its railway, and obtained from the council a stipulation that no privilege or right shall be granted to any other company or individual to run to the same terminal point over the track of its railway. The council, however, reserved the right to permit other companies to occupy the track of the appellant already laid down upon the conditions prescribed.

This contract has never been modified, either by the council or by any amendment to appellant's charter, and whether the exclusive privilege conferred on appellant in denying any other company the right to run to the same terminal point over appellant's track can be enforced as between the appellant and the city, is not a question before us. That provision of the contract has not been violated, so far as this record shows, but has been complied with.

When the appellee entered into its contract with the city, it knew the terms of the legislative grant to the appellant, and the nature of the rights and privileges given it by the contract with the general council, and, therefore, it was provided in the contract with the appellee as follows:

"It is further agreed that the said Central Passenger Railroad Company shall have the privilege of running their cars to Main street on Fourth street, over the track of the Louisville City Railway Company, as provided in section 11 of the agreement between said Louisville City Railway Company and the city of Louisville, *when the consent of* said City Railway Company shall be obtained."

After this the contract between the two companies was entered into, and the consent of the appellant obtained upon the terms therein expressed. The contract is to continue until the appellant's charter expires, and by its terms the appellee is to pay the appellant nine hundred and thirteen dollars and eighteen cents per annum, and keep the streets and track in good repair at its own expense, with' the proviso that when either party became dissatisfied as to the terms, the matter was to be referred to arbitrators for an adjustment on equitable terms.

The contract was not to be canceled as to the right of the appellee to the use of appellant's track, but the terms of the occupancy might be changed by arbitration, in the event the two companies failed to agree.

The contention by the appellee that it derived its right to the use of the appellant's track from the Legislature, and not by contract with the city or with the appellant, and, therefore, is only liable for the use of the rails and ties, can not be sustained.

In the first place, the charter of the appellee gives it no right, unless by implication, to use the rails and ties of the appellant. The right to the appellee

to construct and operate a single or double-track rail-road along this route did not confer the right to use the appellant's tracks. The right to use the property of another without his consent, and without any provision made for compensation, although for the public use, can not well arise from mere implication.

It is argued that as the appellant already had double tracks on Fourth street, it is unreasonable to suppose the Legislature intended to authorize the laying of two additional tracks in the same street by the appellee, and, therefore, the right to the use of the tracks already down must have been the legislative will.

This view seems not only reasonable but clear, when taken in connection with the power previously conferred by the Legislature on the city council with reference to street railways. A general power to contract with companies for the construction of such railways had been previously given the city, with the right to regulate and control the same. Under this power the appellant had executed its contract, and when the Legislature made the grant to the appellee, defining its line of railway, with the right to extend its line to other streets, the power was reserved to the city and the appellee to contract "in such manner and on such terms and conditions, and with such rights and privileges, as the general council may, by contract or otherwise, with said corporation or any of them, prescribe."

They did contract, and it is evident that the city, in prescribing the terms, recognized its obligation to the appellant, and required the appellee to obtain appel-

lant's consent to the use of its tracks on Fourth, between Main and Jefferson. This view is in harmony with the legislation under which the appellee obtained its charter, and the previous legislation conferring on the general council the power to contract for the construction of street railways. Both the Legislature and the appellee looked to this power given the city, and from that source and that only, under such a charter, could the appellee have obtained the right to the use of appellant's tracks.

Neither the law-makers or the appellee could have understood that appellee's charter gave it the right to use appellant's property, where there was no express authority given in the grant to that effect, without appellant's consent or that of the city council; *but* when considering the legislation already in existence with reference to the city on the same subject-matter, the mode of obtaining the use was well understood. The consent of the city having been given that this use might be obtained by the appellee from the appellant, the contract between the two was entered into. The rights or equities of the parties must, to a great extent, be determined by its terms. This is not a case where the one company has the legal right to enter upon and use the track of another company by reason of legislative authority. It is true that the charter confers upon the appellee the right to lay down tracks on Fourth street, but the city having a voice in the regulation of street railways, so essential to its interests, and having contracted with the appellant, required that an arrangement should be made between the two companies, before the one should

use the track of the other; and to accomplish this, the contract regulating the compensation to be paid the appellant was entered into. The one was contracting for the use of so much of the other's tracks as lay in the most populous part of the city, and at a location where, as the proof shows, is the most desirable terminus. At no point can so many passengers be obtained. It is in the business part of the city, the lines of travel going in all directions from that point, and, as the proof shows, the appellee running four times as many cars as the appellant. These valuable contract rights, that were granted to the appellee by the appellant during the existence of its charter, were estimated by the two companies as worth in June, 1866, the sum of nine hundred and thirteen dollars per annum, with the obligation on the part of the appellee to keep the streets and tracks in good repair. Neither party had the right to abandon the contract, but had the right, after notice, to fix upon new terms, and to call on arbitrators, if they failed to agree, "*to determine upon an equitable consideration for the privileges granted the appellee.*"

If this use was worth in 1866 as much as nine hundred and thirteen dollars, what was it worth in 1886 when this judgment was rendered, or at the end of the rental year next ensuing after the date of the notice? The population of the city had increased rapidly from the time of the contract made in June, 1866. The profit in conducting such a business becomes greater as the population increases. The value of the use of the franchise was, at the date of the notice, several thousand dollars annually, greatly more

than any of the parties contemplated, and while the appellant is not entitled to the value of this use, it is evidently entitled to *an equitable consideration*, and what that consideration should be is difficult to determine. If the parties regarded it as worth nine hundred dollars in 1866, it should be worth, per annum, from June, 1881, the year ending after the date of the notice, as much as fifteen hundred dollars per annum.

The parties were evidently contracting with reference to an increase in population when the question of consideration was left open, or could be changed upon notice given by the one party or the other, so, if the profits of travel increased or diminished, either company could avail itself of the advantage. Neither the value of the use of the franchise, or the mere compensation for the use of the rails, formed the basis of the contract stipulations. The two companies acquired contract rights that are capable of being enforced upon equitable terms. The appellant will not be allowed to say that it must have the value of its franchise, or the appellee that it will only pay one hundred and seventy-one dollars per annum as compensation. Neither view of the case would be equitable, or within the true meaning of the joint obligation.

The surrender of the use of appellant's tracks for near thirty years to the appellee, when the city had, by its contract with the appellee, left it voluntary with the appellant as to its consent to the use, and at a point where the life of the city as to travel existed, was something more than a mere nominal

consideration, and, therefore, it seems to us the compensation allowed by the chancellor is entirely inadequate.

The judgment is reversed, and the cause remanded, with directions to fix the compensation at one thousand five hundred dollars per annum, from the twenty-sixth of June, 1881, the other stipulations in the contract to be as binding on the parties as if no change in the compensation had been made.

CASE 43—PETITION EQUITY—MAY 12.